IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

FILED

**February 6, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 13-0491

LAWYER DISCIPLINARY BOARD,
Petitioner

v.

KERRY A. NESSEL,
Respondent

Lawyer Disciplinary Proceeding
No. 10-01-143

REPRIMAND AND OTHER SANCTIONS

Submitted: January 13, 2015
Filed: February 6, 2015

Andrea J. Hinerman, Esq.
Senior Lawyer Disciplinary Counsel
Office of Disciplinary Counsel
Charleston, West Virginia
Counsel for Petitioner

S. Benjamin Bryant, Esq.
Carey, Scott, Douglas &
 Kessler, PLLC
Charleston, West Virginia
Counsel for Respondent

JUSTICE LOUGHRY delivered the Opinion of the Court.

1. "A *de novo* standard applies to a review of the adjudicatory record made for the Committee on Legal Ethics of the West Virginia State Bar [currently, the Hearing Panel Subcommittee of the Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the Committee's recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the Committee's findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syl. Pt. 3, *Comm. on Legal Ethics of the West Virginia State Bar v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994).

2. "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984).

3. "Rule 3.7 of the Rules of Lawyer Disciplinary Procedure, effective July 1, 1994, requires the Office of Disciplinary Counsel to prove the allegations of the formal

charge by clear and convincing evidence." Syl. Pt. 1, in part, *Lawyer Disciplinary Bd. v. McGraw*, 194 W.Va. 788, 461 S.E.2d 850 (1995).

4. "In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession." Syl. Pt. 3, *Comm. on Legal Ethics v. Walker*, 178 W.Va. 150, 358 S.E.2d 234 (1987).

5. "Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: 'In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.'" Syl. Pt. 4, *Office of Disciplinary Counsel v. Jordan*, 204 W.Va. 495, 513 S.E.2d 722 (1998).

6. "Mitigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." Syl. Pt. 2, *Lawyer Disciplinary Bd. v. Scott*, 213 W.Va. 209, 579 S.E.2d 550 (2003).

7. "Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses." Syl. Pt. 3, *Lawyer Disciplinary Bd. v. Scott*, 213 W.Va. 209, 579 S.E.2d 550 (2003).

8. "Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syl. Pt. 4, *Lawyer Disciplinary Bd. v. Scott*, 213 W.Va. 209, 579 S.E.2d 550 (2003).

LOUGHRY, Justice:

This matter is before this Court upon the findings and recommendations of the Hearing Panel Subcommittee ("Hearing Panel") of the Lawyer Disciplinary Board ("LDB") in a consolidated disciplinary proceeding brought against the respondent, Kerry A. Nessel ("Mr. Nessel"). The proceeding involves allegations that Mr. Nessel engaged in professional misconduct by placing small amounts of his personal funds into the prison accounts of certain inmate clients; by soliciting referrals from inmates for possible new litigation; and by refusing to dismiss allegedly frivolous personal injury actions brought on behalf of certain inmates.

Following an evidentiary hearing during which the Hearing Panel accepted, as presented, the parties' joint Stipulations and Recommended Discipline, the Hearing Panel found that Mr. Nessel had violated the West Virginia Rules of Professional Conduct[1] in several respects and recommended that this Court impose a number of sanctions, including a reprimand. Mr. Nessel does not challenge the Hearing Panel's findings, and both he and the Office of Disciplinary Counsel ("ODC") urge this Court to adopt the Hearing Panel's recommended sanctions. After a careful review of the parties' briefs, the arguments of

---

[1]The West Virginia Rules of Professional Conduct were substantially amended effective January 1, 2015. To resolve the matter before us, we apply the Rules of Professional Conduct in effect at the time the instant charges were brought.

1

counsel, the record submitted, and the applicable law, this Court finds that there is clear and convincing evidence to support the Hearing Panel's findings. Accordingly, this Court imposes the Hearing Panel's recommended sanctions.

## I. Factual and Procedural History

Mr. Nessel was admitted to The West Virginia State Bar on April 13, 1999. Since 2002, his law practice has included litigation filed against the West Virginia Division of Corrections ("DOC") on behalf of female inmates who allege that they were sexually assaulted by corrections officers or others while incarcerated in regional jails and/or the Lakin Correctional Center ("Lakin").[2] As of 2013, Mr. Nessel had represented more than 125 inmates either in, or in contemplation of, such litigation.

This disciplinary proceeding involves two separate complaints filed with the LDB against Mr. Nessel.[3] The first complaint was based on allegations received from Lori A. Nohe, the warden at Lakin. Allegations received from Kelly C. Morgan, a member of The West Virginia State Bar, formed the basis of the second complaint. Given the similarities

---

[2]Mr. Nessel describes his practice as including appointed criminal defense work and personal injury litigation arising out of motor vehicle accidents.

[3]These complaints resulted in a formal Statement of Charges being issued against Mr. Nessel by the LDB, which was filed in this Court on May 13, 2013. Mr. Nessel filed a timely, verified answer to the Statement of Charges.

in the factual allegations and issues involved, the ODC merged the two matters, each of which is discussed below.

By letter dated March 23, 2010, Warden Nohe advised the ODC of her belief that Mr. Nessel was offering money to Lakin inmates for referrals for sexual assault cases against the DOC. She provided the ODC with a statement taken on January 4, 2010, from inmate S.F.[4] by DOC investigator John Sallaz.[5] During her statement, inmate S.F. alleged that her name was provided to Mr. Nessel by another inmate, T.S.;[6] that Mr. Nessel sought information from her regarding sexual assaults by guards at a regional jail;[7] that he advised her that she could have a claim for merely witnessing actions of a sexual nature by corrections officers; that she told him that she "didn't want no part of that"; that he requested the names of other inmates who would be willing to discuss a possible sexual assault case with him; and that he offered to place a percentage of any settlement money received from

---

[4]We use the initials of the inmates referenced in this matter given the sensitive nature of the facts in this case. *See State v. Edward Charles L.*, 183 W.Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990) ("Consistent with our practice in cases involving sensitive matters, we use the victim's initials.").

[5]John Sallaz currently serves as the deputy warden at Lakin. During the course of the ODC's investigation, Mr. Sallaz gave a sworn statement in which he recounted his interview of S.F.

[6]T.S. has been Mr. Nessel's client for several years.

[7]It appears that inmate S.F. was previously incarcerated at the Western Regional Jail before being transferred to Lakin.

those other cases into an account that she could access upon her release from prison.[8]  Based on the allegations received from Warden Nohe, the ODC opened a complaint against Mr. Nessel on March 29, 2010.[9]

During its investigation of Warden Nohe's allegations, the ODC received a letter dated September 16, 2011, from Kelly C. Morgan, an associate with Bailey & Wyant, P.L.L.C.  Ms. Morgan defended the West Virginia Department of Education in litigation

---

[8]Inmate S.F. also indicated during her statement that Mr. Nessel told her that the parole board owed him favors and that he could get her released from prison the next time she appeared before the parole board.  Mr. Nessel states that while he offered to write a letter to the parole board on S.F.'s behalf, her allegation regarding him being owed favors was ridiculous since the DOC "cannot stand" him due to the number of lawsuits he has brought against it and certain of its employees.

[9]During the course of its investigation, the ODC received a sworn statement from DOC investigator Robin Ramey.  Ms. Ramey reported that various inmates and staff had alleged that Mr. Nessel had offered money for referrals for lawsuits, including inmate M.C.  The evidence shows, however, that M.C. made contradictory reports.  The record contains a transcript of inmate M.C.'s deposition taken in litigation brought against the DOC by another inmate.  The DOC's counsel used the deposition as an opportunity to question M.C. regarding Mr. Nessel.  M.C. conceded that certain of the allegations she made against Mr. Nessel to DOC investigator Ramey involved other lawyers—not Mr. Nessel.  Although M.C. testified that inmate T.S. told her that Mr. Nessel had offered T.S. a "finder's fee" for "finding girls that would file lawsuits," she also testified she was unaware that T.S. had acknowledged that her representation of a "finder's fee" was inaccurate.  M.C. further testified that although lawyers, including Mr. Nessel, wanted her to say she had been sexually abused by a particular corrections officer at Lakin, she had not been abused.  The record reflects, however, that M.C. later filed a civil action against the DOC in which she alleged she had an intimate relationship with this corrections officer, who is no longer employed by the DOC.  During Warden Nohe's testimony before the Hearing Panel, as more fully discussed *infra*, she agreed that "M.C. completely contradicted herself . . . by what she told the investigators in [the Warden's] investigation and what she is alleging in the lawsuit."

4

brought on behalf of inmates by Mr. Nessel. Ms. Morgan made similar allegations that Mr. Nessel was buying referrals from inmates and enclosed with her letter a copy of S.F.'s statement given to Mr. Sallaz. She also alleged misconduct by Mr. Nessel arising out of litigation he filed on behalf of Lakin inmates J.Q. and S.R. against Wexford Health Resources, Inc., her client, and/or Dr. John Pellegrini, a Wexford employee or contractor.[10] The litigation included allegations that Dr. Pellegrini had sexually abused Mr. Nessel's inmate clients while they were receiving medical treatment at Lakin.[11] Ms. Morgan alleged that although she advised Mr. Nessel that inmate J.Q. was released from Lakin prior to Dr. Pellegrini's employment there and that inmate S.R. had no claims against Dr. Pellegrini or Wexford and had never even consulted with Mr. Nessel, he refused to dismiss J.Q. and/or S.R. from the litigation.[12] Based on Ms. Morgan's allegations, the ODC opened another complaint against Mr. Nessel, which it merged with the prior complaint given the convergence of facts and issues involved.[13]

---

[10]Wexford provides in-house contractual medical services at DOC facilities, and Dr. Pellegrini provided medical services at Lakin.

[11]The record reflects that on November 28, 2012, Dr. Pellegrini's medical license was suspended by the West Virginia Board of Osteopathic Medicine for unethical and inappropriate sexual misconduct involving female patients at another facility.

[12]Ms. Morgan alleged that Mr. Nessel did not obtain Wexford medical records for his inmate clients to assure the accuracy of their allegations prior to filing the civil actions against Wexford. Mr. Nessel's repeated failure to respond to her correspondence during the litigation was also included in her allegations.

[13]The ODC states in its appellate brief that it also received a letter dated June 20,
(continued...)

5

Mr. Nessel filed written responses and gave sworn statements to the ODC in which he denied the allegations made by Warden Nohe and Ms. Morgan. He expressed his belief that the DOC is on a "'witch hunt' to disparage [his] good name and character[,]" adding that inmate clients had reported to him that either their parole was revoked, or they were subjected to fabricated prison violations, or they were held at Lakin for months after being awarded parole, all for the purpose of coercing favorable testimony for the DOC and its staff in pending sexual assault lawsuits.

In specifically addressing S.F.'s allegations, Mr. Nessel provided the ODC with a copy of her handwritten letter to him dated August 29, 2009, which was several months before she gave her statement to then DOC investigator Sallaz. In her letter, S.F. sought Mr. Nessel's legal representation for her "anxiety attacks," which she attributed to the witnessing of a corrections officer engaging in sexual acts while she was incarcerated at a regional jail.[14] Mr. Nessel expressed his belief that S.F. was upset with him because he refused to represent

---

[13](...continued)
2012, from Lou Ann Cyrus, an attorney with Shuman, McCuskey & Slicer, PLLC, a law firm that serves as counsel for the DOC in the prison sexual assault litigation. The ODC states that Ms. Cyrus provided it with transcripts of several telephone calls between two of Mr. Nessel's inmate clients and their respective family and friends. Neither Ms. Cyrus's letter nor the transcripts of these telephone calls were they admitted into evidence before the Hearing Panel, nor are they in the record before this Court.

[14]As discussed previously, this is the type of claim that S.F. would later tell Mr. Sallaz that she wanted "no part of."

her upon learning that she had been untruthful. In further addressing the allegation that he bought referrals, Mr. Nessel stated that he had

> cleared everything up with [inmate T.S.] concerning her misconception of me providing her a "finder's fee" for referring cases to me. I have never, and will never, give any client or . . . any non-client, a "finder's fee" for referring . . . a case to me. [T.S.] may have assumed that I would have provided her with such fee but her assumption is incorrect and she now realizes that.

He explained that his clients would speak to other inmates who had gone through similar adverse experiences while incarcerated, and his name would arise in that context. Although he denied that he was "buying referrals," Mr. Nessel reported that he had sent small amounts of his own money[15] to inmate clients "out of the kindness of [his] heart" and because he felt sorry for them. He added that on a few occasions he directed his employee, Michael Ferguson,[16] to send the money. Stating that his actions were a violation of the Rules of Professional Conduct, Mr. Nessel indicated that he would take corrective measures to ensure that it did not happen again.[17]

---

[15]Mr. Nessel described these amounts as being from twenty-five dollars to fifty dollars.

[16]Mr. Ferguson gave a sworn statement to the ODC during which he stated that over the course of two years, Mr. Nessel occasionally sent, or had him to send, small amounts of money to inmate clients at Lakin. He stated that he never heard Mr. Nessel offer incarcerated clients money, although clients often called the law office asking for money. Mr. Ferguson explained that both he and Mr. Nessel felt sorry for their inmate clients.

[17]On July 6, 2012, Warden Nohe advised the ODC that Mr. Nessel sent two checks which were processed at Lakin. One check was made payable to his client, inmate J.M., as

(continued...)

7

With regard to the allegations related to the Wexford/Dr. Pellegrini litigation, Mr. Nessel stated that he could not simply rely upon Ms. Morgan's representations regarding J.Q. and S.R. given his prior experience with the DOC and its unreliable document production during litigation. Mr. Nessel acknowledged it became apparent he had misspelled the last name of S.R. in the pleadings he filed,[18] and that S.R. was ultimately dismissed from the Wexford/Dr. Pellegrini litigation as a result. Regarding inmate J.Q., Mr. Nessel stated he had previously represented her in other litigation[19] and, therefore, believed her when she told him that she had been seen by Dr. Pellegrini. He added that his records showed that J.Q. was at Lakin during Dr. Pellegrini's tenure there. Although defense counsel filed a motion for sanctions in the circuit court based on Mr. Nessel's refusal to dismiss J.Q., Mr. Nessel

---

[17](...continued)
part of the distribution of settlement funds she received in a civil action against the DOC. J.M. had directed Mr. Nessel to send fifteen hundred dollars of her settlement proceeds to her friend, inmate A.M., as a gift. Because the second check, which was made payable to A.M., reflected that it was a gift from J.M., it could not be processed at Lakin. The check was returned to Mr. Nessel advising him of the disallowance.

[18]Mr. Nessel testified before the Hearing Panel that S.R. was originally "signed up" by another lawyer, Mike Woefel, with whom he consulted and collaborated in the prison sexual assault litigation, and that the misspelling of her last name "sort of fell through the cracks" as between their two law offices.

[19]Mr. Nessel stated that this other litigation involved allegations that J.Q. was sexually assaulted by a teacher at Lakin; that Ms. Morgan, who represented the state department of education, had insisted that J.Q.'s allegations were contrived; that the DOC's supplemental discovery response demonstrated that J.Q. had been truthful; and that the case settled for a quarter of a million dollars "because they [the DOC] were about to get exposed."

8

advised the ODC that the circuit court denied this motion.[20] He further advised that the circuit court granted defense counsel's motion to dismiss J.Q. from the litigation, but did so without prejudice based upon his failure to secure service of process—not because the action was frivolous.[21]

On May 13, 2014, a hearing was held before the Hearing Panel on these consolidated charges. The ODC and Mr. Nessel jointly submitted Stipulations and Recommended Discipline to the Hearing Panel. The only witnesses to testify before the Hearing Panel were Warden Nohe and Mr. Nessel.

Warden Nohe testified that she contacted the ODC because Mr. Nessel was visiting a higher than usual number of inmates at one time[22] and because his firm had deposited money into the prison accounts of five or six inmates. When asked whether she

---

[20]Mr. Nessel provided the ODC with a copy of the transcript of the hearing before the circuit court during which the motion for sanctions was denied.

[21]Mr. Nessel provided a copy of the circuit court's order to the ODC.

[22]Mr. Nessel testified that he visited with as many as ten to fifteen inmates in one day because he is a solo practitioner, as well as single father; that none of the employees at Lakin ever complained to him about the number of inmates he was visiting; and that he always wrote to the prison in advance of his visits and listed the inmates with whom he wished to speak. He stated that some of the inmates were his clients, while others were witnesses. Warden Nohe conceded that a lawyer has a duty to find witnesses to support his clients' claims. She added that Mr. Nessel's visits led to a change in prison rules and that only five inmates may now be seen on any given day by an attorney.

was aware of other lawyers giving money to inmates, Warden Nohe responded, "to give money to an inmate for her own personal need, it's never happened. . . . to actually put money on the books for inmates, I've never seen it."[23] Warden Nohe further testified that she was before the Hearing Panel because she does not "like what he's been doing"; that she thought he "was inmate shopping"; and that the lawsuits against the DOC were "frivolous."

Mr. Nessel testified consistent with his prior written responses and sworn statements regarding the charge that he was buying referrals and the charge related to the Wexford/Dr. Pellegrini litigation. Regarding his deposits of personal funds into the prison accounts of certain inmate clients, Mr. Nessel admitted before the Hearing Panel that he sent, or caused to be sent, his personal funds to certain inmate clients on four to seven occasions in amounts anywhere from twenty-five dollars to fifty dollars over a three-year period.[24] Mr.

---

[23]In *Lawyer Disciplinary Board v. Stanton*, 233 W.Va. 639, 760 S.E.2d 453 (2014), George Stanton, III, was charged, *inter alia*, with depositing money into the prison accounts of certain inmates at Lakin for their personal use in violation of Rule 1.8(e). We observe that the allegations against Mr. Stanton were made around the same time as Warden Nohe's allegations against Mr. Nessel, and that Warden Nohe testified before the Hearing Panel regarding Mr. Stanton in August of 2013, or approximately eight months prior to her testimony in the current proceeding. Accordingly, we find Warden Nohe's testimony that she had never seen a lawyer deposit money into an inmate's prison account to be questionable.

[24]During oral argument before this Court, disciplinary counsel stated that prison records showed that a total of one hundred and fifty dollars had been deposited by Mr. Nessel, or at his direction, into certain inmate client prison accounts.

10

Nessel testified that he, as well as his then employee, Mr. Ferguson,[25] felt sorry for his clients, who repeatedly telephoned his law office complaining of a lack of funds to purchase items from the prison commissary. As Mr. Nessel explained,

> it was not done to curry favor with anyone, for somebody to find me cases. In fact, I was turning down ten cases per one case I'd take. So it had nothing to do with that. . . . And, again, it hasn't happened again. It's gone so far as I don't even do litigation expenses.

When asked to explain why inmates would seek him out for representation, Mr. Nessel responded:

> I started off doing these [prison sexual assault cases] in about 2002. I became - - I sort of had a niche for it . . .
>
> • • • •
>
> [W]e got some good settlements on it, you know, word would come around and witnesses would pop up and word of mouth in the penal system in West Virginia is rather prevalent.

He advised the Hearing Panel that he knew it was wrong to send money to his inmate clients and that he had taken corrective measures to ensure that it would never happen again.

On June 19, 2014, the Hearing Panel filed its Report with this Court, indicating it had considered and accepted the facts, conclusions, and recommendations set forth in the Stipulations and Recommended Discipline jointly submitted by the ODC and Mr. Nessel.

---

[25]The record reflects that Mr. Ferguson's employment with Mr. Nessel ended in July of 2013.

The Stipulations included Mr. Nessel's admission that he violated Rule 1.8(e)[26] when he deposited his personal funds into certain inmate clients' prison accounts at Lakin; that he violated Rule 5.3(b) and (c)[27] when he directed, caused, or ratified similar deposits by his employee, Mr. Ferguson; and that he violated Rule 8.4(a) and (d)[28] through his violation of Rules 1.8(e) and 5.3(b) and (c). Included in the Stipulations was the recommendation that the charges related to the Rule 3.1[29] violation arising out of the Wexford/Dr. Pellegrini litigation and the Rule 7.3[30] violation involving the alleged "buying" of referrals be dismissed "because the charges are not supported by the evidence."

Consistent with the parties' Stipulations and Recommended Discipline, the Hearing Panel has recommended to this Court that Mr. Nessel be reprimanded; that he be required to complete an additional nine hours of continuing legal education in ethics/office management during the next reporting period; that his law practice be supervised for one year by an attorney agreed upon between the ODC and Mr. Nessel with the goal of improving the

---

[26]*See infra* note 31.

[27]*See infra* note 32.

[28]*See infra* note 33.

[29]Rule 3.1 of the Rules of Professional Conduct involves meritorious claims and contentions.

[30]Rule 7.3 of the Rules of Professional Conduct addresses the solicitation of clients.

12

quality and effectiveness of his law practice to the extent that his misconduct is not likely to recur; and that he pay the costs of the disciplinary proceeding.

## II. Standard of Review

The standard for review in lawyer disciplinary proceedings is well-settled:

> A *de novo* standard applies to a review of the adjudicatory record made for the Committee on Legal Ethics of the West Virginia State Bar [currently, the Hearing Panel Subcommittee of the Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the Committee's recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the Committee's findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Syl. Pt. 3, *Comm. on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994). Although we give substantial deference to the Hearing Panel's factual findings, "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984). With these principles in mind, we proceed to consider the Hearing Panel's findings and recommendations.

13

## III. Discussion

### A. Misconduct

Through its acceptance of the parties' joint Stipulations, the Hearing Panel found that Mr. Nessel violated Rules 1.8(e),[31] 5.3(b) and (c),[32] and 8.4(a) and (d)[33] of the

---

[31]Rule 1.8 provides, in pertinent part, as follows:

(e) A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:

(1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and
(2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.

[32]Rule 5.3 provides, in pertinent part, as follows:

With respect to a nonlawyer employed or retained by or associated with a lawyer:
• • • •
(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
(2) the lawyer is a partner in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the

(continued...)

14

Rules of Professional Conduct when he deposited, or directed his employee, Mr. Ferguson, to deposit, Mr. Nessel's personal funds into the prison accounts of certain inmate clients at Lakin. The Hearing Panel also accepted the recommendation in the Stipulations that the charges arising out of the allegedly frivolous Wexford/Dr. Pellegrini litigation, as well as the allegations that he solicited professional employment from inmates at Lakin, be dismissed as unsupported by the evidence.

Rule 3.7 of the Rules of Lawyer Disciplinary Procedure "requires the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence." Syl. Pt. 1, in part, *Lawyer Disciplinary Bd. v. McGraw*, 194 W.Va. 788, 461 S.E.2d 850 (1995). Based upon our review of the submitted record, and after affording

---

[32](...continued)
> conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

[33]Rule 8.4 of the Rules of Professional Conduct provides, in pertinent part:

> It is professional misconduct for a lawyer to:
>
>   (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; [or]
>     • • • •
>   (d) engage in conduct that is prejudicial to the administration of justice[.]

substantial deference to the findings of fact of the Hearing Panel,[34] we concur in the Panel's findings and conclusions.

There is clear and convincing evidence in the record that Mr. Nessel violated Rules 1.8(e), 5.3(b) and (c), and 8.4(a) and (d) through his provision of financial assistance to litigation clients.[35] Mr. Nessel's admission that he violated Rule 1.8(e) is an implicit concession of a connection between the financial assistance he provided and the litigation in which he represented his inmate clients. While Mr. Nessel has stated that his financial assistance was given to enable his inmate clients to purchase necessary items from the prison commissary and because he felt sorry for them, his clearly impermissible conduct is not excused by his stated altruistic intent. As one court has explained, "[e]ven if [the lawyer's] sole intention was to benefit [his client], that intention does not excuse his conduct. The prohibition against providing financial assistance to a client is absolute. Prof[essional] Cond[uct] R[ule] 1.8(e) does not inquire into the attorney's motivation in providing financial assistance to a client." *Toledo Bar Assn. v. Pheils*, 951 N.E.2d 758, 763 (Ohio 2011); *see also In re Hoffmeyer*, 656 S.E.2d 376, 378 (S.C. 2008) ("The rule [1.8(e)] does not distinguish between loans and gifts, and the term 'financial assistance' is unambiguous and encompasses both loans and gifts of money."). Mr. Nessel has also admitted he violated Rule

---

[34]*See McCorkle*, 192 W.Va. 286, 452 S.E.2d 377, syl. pt. 3, in part.

[35]There are two limited exceptions to this Rule, neither of which applies to the instant proceeding. *See supra* note 31.

5.3(b) and (c)[36] when he directed or ratified the deposits made by his then employee, Mr. Ferguson, into certain of his clients' prison accounts. Given these admissions, Mr. Nessel has conceded that his conduct violated Rule 8.4 (a) and (d).[37]

Having identified the Rules of Professional Conduct that Mr. Nessel violated, we now turn to the charges related to violations of Rules 3.1 and 7.3, which the Hearing Panel recommends be dismissed through its acceptance of the parties' Stipulations. The record before us reflects that the sworn statements and/or testimony given by inmates regarding Mr. Nessel's alleged solicitation of business or referrals were shown either to be untruthful or contradictory in nature. As for the allegedly frivolous Wexford/Dr. Pellegrini litigation,[38] the record reflects Mr. Nessel eventually agreed to inmate S.R.'s dismissal from that litigation based upon an error in the spelling of her last name. And, although the circuit court dismissed J.Q.'s civil action, it did so without prejudice based on Mr. Nessel's failure to secure service of process. The circuit court refused defense counsel's motion for sanctions against Mr. Nessel in that matter. In short, we are unable to find that the evidence in the record before us meets the requisite level of clear and convincing evidence to support these

---

[36]*See supra* note 32.

[37]*See supra* note 33.

[38]As noted previously, Dr. Pellegrini's medical license was suspended for engaging in sexual misconduct with female patients, albeit at a different facility.

particular charges. Accordingly, we concur in the Hearing Panel's acceptance of the parties'

recommendation that these charges be dismissed.


**B. Sanctions**

Having determined that Mr. Nessel violated the Rules of Professional Conduct,

we must now determine the appropriate sanctions to be imposed. In this regard, we will

consider

> not only what steps would appropriately punish the respondent
> attorney, but also whether the discipline imposed is adequate to
> serve as an effective deterrent to other members of the Bar and
> at the same time restore public confidence in the ethical
> standards of the legal profession.

Syl. Pt. 3, in part, *Comm. on Legal Ethics v. Walker*, 178 W.Va. 150, 358 S.E.2d 234 (1987).

In making such determinations,

> Rule 3.16 of the West Virginia Rules of Lawyer
> Disciplinary Procedure enumerates factors to be considered in
> imposing sanctions and provides as follows: "In imposing a
> sanction after a finding of lawyer misconduct, unless otherwise
> provided in these rules, the Court [West Virginia Supreme Court
> of Appeals] or Board [Lawyer Disciplinary Board] shall
> consider the following factors: (1) whether the lawyer has
> violated a duty owed to a client, to the public, to the legal
> system, or to the profession; (2) whether the lawyer acted
> intentionally, knowingly, or negligently; (3) the amount of the
> actual or potential injury caused by the lawyer's misconduct;
> and (4) the existence of any aggravating or mitigating factors."

Syl. Pt. 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W.Va. 495, 513 S.E.2d 722

(1998).

In applying the Rule 3.16 factors, we find that Mr. Nessel admitted to knowingly violating the Rules of Professional Conduct, as well as his duties to his clients and to the legal profession, when he deposited, and/or caused his employee to deposit, his personal funds into certain of his clients' prison accounts. Further, the parties state that Mr. Nessel's clients did not suffer any injury as a result of his misconduct, and we find no evidence in the record to the contrary.

Regarding the fourth factor under Rule 3.16–mitigating and aggravating factors–we look to *Lawyer Disciplinary Board v. Scott*, 213 W.Va. 209, 579 S.E.2d 550 (2003), for guidance. In *Scott*, we held that "[m]itigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." 213 W.Va. 209, 579 S.E.2d 550, syl. pt. 2. As we enumerated,

> [m]itigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

19

*Id.*, syl. pt. 3. The Hearing Panel found several mitigating factors inuring to Mr. Nessel's benefit, including his lack of a prior disciplinary record; his cooperative attitude toward the proceeding; his timely good faith effort to rectify the consequences of his misconduct; and his remorse for his misconduct.[39]

Having considered the mitigating factors, we must also ponder the aggravating factors. As we instructed in *Scott*, "[a]ggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." 213 W.Va. 209, 579 S.E.2d 550, syl. pt. 4. The Hearing Panel found that the aggravating factors were Mr. Nessel's multiple offenses of depositing or causing to be deposited his personal funds into his clients' prison accounts, which established a pattern of misconduct, as well as his substantial experience in the practice of law.

In consideration of all of the factors set forth in Rule 3.16 of the Rules of Lawyer Disciplinary Procedure, we are compelled to conclude that the Hearing Panel's recommended sanctions are warranted. Indeed, the recommended imposition of a reprimand[40] is both appropriate and consistent with our prior decisions for similar

---

[39]The Hearing Panel also found that Mr. Nessel's being the sole parent of a minor son, who is very active in school activities and sports, was a mitigating factor.

[40]A reprimand is defined as "a form of public discipline . . . which declares the conduct of the lawyer improper, but does not limit the lawyer's right to practice." *See*

(continued...)

misconduct.  *See Lawyer Disciplinary Bd. v. McCormick*, 199 W.Va. 283, 483 S.E.2d 866 (1997) (imposing public reprimand and other sanctions where lawyer violated various Rules of Professional Conduct based upon multiple complaints, including violation of Rule 1.8(e), through his monetary loan to client for personal property taxes and automobile insurance); *Lawyer Disciplinary Bd. v. Otis R. Mann, Jr.*, No. 23012 (W.Va. Jan. 16, 1997) (admonishing lawyer for violating Rule 1.8(e) by advancing client amounts of money and by loaning same client money toward purchase of mobile home).[41]  We also concur in the balance of the Hearing Panel's recommended sanctions.  Cumulatively, these sanctions will serve to punish Mr. Nessel for his misconduct; deter other attorneys from engaging in similar misconduct; and "restore public confidence in the ethical standards of the legal profession." *See Walker*, 178 W.Va. 150, 358 S.E.2d 234, syl. pt. 3, in part.

---

[40](...continued)
Section 2.5, in part, *ABA Standards for Imposing Lawyer Sanctions*.

[41]Similarly, other courts have imposed reprimands for violations of Rule 1.8(e).  *See In the Matter of Jack O. Morse*, 748 S.E.2d 921 (Ga. 2013) (reprimanding attorney who violated Rule 1.8(e) by loaning money to client so client could avoid foreclosure); *Hanish v. Kentucky Bar Ass'n*, 875 S.W.2d 95 (Ky. 1994) (publicly reprimanding lawyer for advancing or guaranteeing financial assistance to clients in violation of Rule 1.8(e)); *The Mississippi Bar v. Attorney HH*, 671 So.2d 1293 (Miss. 1995) (finding private reprimand warranted for attorney's loans to indigent client to cover personal living expenses in violation of Rule 1.8(e)); *In re Furino*, 4 A.3d 151 (N.J. 2010) (reprimanding lawyer who violated, *inter alia*, Rule 1.8(e)); *In re Mayer*, 722 S.E.2d 800 (S.C. 2012) (publicly reprimanding lawyer who violated, *inter alia,* Rule 1.8(e)).

## IV. Conclusion

For the foregoing reasons, we adopt the Hearing Panel's recommendations and impose the following sanctions: that Mr. Nessel be reprimanded; that his law practice be supervised for a period of one year by an attorney agreed upon between the ODC and Mr. Nessel with the goal of improving the quality and effectiveness of his law practice to the extent that the misconduct for which he is being sanctioned is not likely to recur; that he be required to attend an additional nine hours of continuing legal education in the area of ethics and law office management above that which is already required during the next reporting period; and that he pay the costs of this disciplinary proceeding.

Reprimand and Other Sanctions.